CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

August 07, 2026

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| AHMAD PRICE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:24-cv-00495 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| SERGEANT M. HUBBARD, *et al.*, | ) | By:    Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendants. | ) | |

Plaintiff Ahmad Price, a Virginia inmate proceeding *pro se*, filed this action under 42 U.S.C. § 1983 against Defendants Sergeant M. Hubbard, Sergeant Jones, Jonathan Nicolo, Cory Allen, Christopher King, and Kelly Ramey.[1] (*See* Compl. [ECF No. 1].) This matter is before the court on Defendants' motion for summary judgment. (ECF No. 28.) For the following reasons, the court will grant the motion for summary judgment in part and deny it in part.[2]

## I.    BACKGROUND

This matter stems from events that allegedly occurred while Price was incarcerated at the Red Onion State Prison ("Red Onion") in Pound, Virginia. (*See* Compl. at 2.) Hubbard, Jones, Nicolo, Allen, and Ramey are correctional officers at Red Onion holding varying roles. (*See id.* at 7–8.) King is a correctional officer at the Wallens Ridge State Prison ("Wallens

---

[1] In his complaint, Price respectively named Nicolo, Allen, and Ramey as "SRT Officer # 1," "SRT Officer # 2," and "Red Onion Hearings Officer." (*See* Compl. at 6.) These Defendants have subsequently filed notices providing their correct identities. (*See* ECF Nos. 15, 16, 17.)

[2] As discussed further below, Defendants move for summary judgment solely by arguing that Price failed to exhaust administrative remedies. (*See* ECF No. 29.) In their briefing, Defendants request that, should the court deny their motion on the issue of exhaustion, they be afforded an additional opportunity to move for summary judgment on the merits of Price's allegations. (*Id.* at 2 n.1.) Because the court will only grant the instant motion in part, it will permit Defendants the opportunity to file another motion for summary judgment addressing the merits of Price's remaining claims.

Ridge") in Big Stone Gap, Virginia. (*See id.* at 8.) Price makes the following allegations in his complaint, which is verified (*see id.* at 4, 16) and is therefore properly considered an affidavit when ruling on summary judgment. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991).

Price alleges that on March 13, 2024, between 8:50 a.m. to 9:50 a.m., he was handcuffed and taken to a disciplinary hearing based on a disciplinary report written by Jones. (Compl. at 8.) Price claims that the report was false and alleges that he made several attempts "to acquire complaints" and "made several verbal complaints" challenging Jones's report. (*Id.*) According to Price, in the period between the issuance of the report and the disciplinary hearing, he was told by several staff at Red Onion that he "better stop [his] complaining or [he] would end up [at] Wallens Ridge[,] where [Price would] 'get what [he] was looking for.'" (*Id.* at 8–9.) Price further alleges that staff at Red Onion and Wallens Ridge "regularly bounce inmates back and forth between the two prisons" and subject inmates to abuse after transfer. (*Id.* at 9.)

Price claims that, during the disciplinary hearing, he was forced to choose between "accept[ing] representation by an advisor" who was part of a group of correctional officers Price had made complaints about or "conduct[ing] [the disciplinary hearing] without any advisor at all."[3] (*Id.* at 9–10.) Price further alleges that he was only permitted to discuss defense strategy with his advisor in the presence of Ramey, the Inmate Hearings Officer who conducted the disciplinary hearing, which Price claims was "against policy." (*Id.* at 10.)

After Price allegedly "insisted that [he] be given [his] due process rights" and, if not, he would "write . . . up" Ramey and Hubbard, Hubbard allegedly became "irate and started to threaten [Price]." (*Id.*) Price further alleges that Hubbard cursed at him, grabbed him, and

---

[3] According to Price, Hubbard served as his advisor during the disciplinary hearing. (Compl. at 10.)

pushed him out of the office where the hearing was being held, and allegedly told Price that he did not "know who [Hubbard] was and [that Hubbard would] fuck [Price] up right then and there." (*Id.* at 10–11.) Hubbard then allegedly told Ramey that Price would "not be allowed any hearing." (*Id.* at 11.)

While Jones was allegedly removing Price's handcuffs outside of the office, Price "gestured" to Ramey to ask about the hearing and said that "this officer"[4] cannot "just deny [Price his] hearing." (*Id.*) According to Price, Hubbard then came out of the office, pushed Price against a wall, and "further threatened" him. (*Id.*) Price alleges that Jones then held him against a wall while Hubbard "tried to attack" Price by striking him on his chest and neck. (*Id.*) Price further alleges that Jones then "pushed [Price] away." (*Id.*)

Price also alleges that, later that day, an unnamed officer came to his cell to tell Price that "the sergeant" wrote Price "a false charge." (*Id.*) The following day, Price was allegedly taken from his cell to "the sergeant's office" to "receive" the supposedly false charge. (*Id.* at 11–12.) According to Price, the charge was written by Hubbard and stated that Price had threatened to "do bodily harm" to the officer. (*Id.* at 12.) Price alleges that one of the officers who "took" him from his cell asked Price, "You know where you are going now and what's going to happen to you[?]" (*Id.*) After Price "asked where," the officer allegedly told Price that he "would be going to Wallens Ridge so [that] the 'Good Ole Boys will take care of [Price].'" (*Id.*)

The following day, Price claims that Nicolo and Allen came to his cell to search it. (*Id.*) During the search, Nicolo allegedly stated to Price, "I heard you are going to write my buddy

---

[4] It is not clear to the court which Defendant or Defendants Price is referencing here.

Hubbard up." (*Id.*) According to Price, he responded by stating that Nicolo's "buddy has a problem with abusing inmates[,] so yeah I will write him up and file a law suit [sic] too." (*Id.*) Nicolo then allegedly "squeezed" Price's arm "very tightly" and said, "[W]e will see about that." (*Id.*) Then, a few minutes later, Allen allegedly stated that he found "a weapon" in Price's cell. (*Id.* at 13.) Nicolo and Allen then allegedly wrote a "false report for a weapons charge" in which they stated that Price had accepted ownership over the weapon, which Price claims was not true. (*Id.*)

According to Price, after a hearing on "another charge[,]" Ramey "turned the recorder off and made a phone call." (*Id.*) Price alleges that after the call was answered, Ramey told the person on the other end, "I have Price here." (*Id.*) Then, the "voice on the other end" said, "[H]ey Price[,] this is King[,] remember me[?]" (*Id.*) Price claims that he had "problems" with King when the officer was a major at Red Onion. (*Id.*) According to Price, King then said, "I'll be seeing you here [at] Wallen's Ridge[,] and if you think you got troubles now well you ain't seen nothing yet." (*Id.*) Price further alleges that Ramey "just smirked" as King spoke and then said, "We[']ll have him over there to you soon." (*Id.*)

On July 26, 2024, Price executed his complaint. (*See id.* at 4.) Price asserts claims against Defendants arising under the First and Eighth Amendments as well as Virginia state law. (*See id.* at 14–15.) As to Hubbard, Price claims that the officer violated his rights and/or committed torts against him by (i) denying Price a hearing; (ii) grabbing, hitting, and threatening Price; and (iii) writing Price a false disciplinary charge. (*Id.* at 14.) As to Jones, Price claims that the officer violated his rights and/or committed torts against him by failing to intervene while Hubbard was allegedly "attack[ing]" Price. (*Id.*) As to Nicolo and Allen, Price claims that the officers violated his rights by falsely accusing him of possessing a weapon, and claims that the

- 4 -

officers' actions were retaliation for Price's complaints against Hubbard. (*Id.* at 15.) As for Ramey, Price claims that the officer violated his rights during and after disciplinary hearings as retaliation for Price's complaints against Red Onion staff and as "part of a conspiracy" to deprive Price of his constitutional rights. (*Id.*) Finally, as to King, Price claims that the officer's actions were part of a conspiracy to deprive Price of his constitutional rights and were retaliatory in nature. (*Id.*)

On January 23, 2026, Defendants filed their motion for summary judgment. (ECF No. 28.) Defendants argue that they are entitled to summary judgment on Price's claims because he failed to exhaust administrative remedies before bringing this action, as required by the Prison Litigation Reform Act (the "PLRA"). (*Id.* at 2.) Although Price was provided notice of the motion pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975) (per curiam) (*see* ECF No. 30), he did not file any response in opposition.[5] The motion for summary judgment is therefore ripe for disposition.

## II.    STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

[5] Indeed, Price has not filed anything on the docket since October 22, 2025. (*See* ECF No. 26.)

242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot

- 6 -

grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

### III.   ANALYSIS

Defendants argue that summary judgment is proper here because Price failed to exhaust his available administrative remedies before filing this action, as required by 42 U.S.C. § 1997e(a). (*See* ECF No. 29 at 2.) For the following reasons, the court partially agrees with Defendants and will accordingly grant their motion for summary judgment in part.

### A. Exhaustion of Administrative Remedies

The PLRA requires inmates to exhaust all available remedies before filing lawsuits challenging prison conditions. *Ramirez v. Collier*, 595 U.S. 411, 421 (2022). This requirement "gives a prison a full 'opportunity to correct its own mistakes' before federal litigation is launched." *Moss v. Harwood*, 19 F.4th 614, 621 (4th Cir. 2021) (quoting *Woodford v. Ngo*, 548 U.S. 81, 89 (2006)). To adequately exhaust administrative remedies, "prisoners must 'complete the administrative review process in accordance with the applicable procedural rules'" defined by the prison grievance process. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (quoting *Woodford*, 548 U.S. at 88); *see also Woodhouse v. Duncan*, 741 F. App'x 177, 178 (4th Cir. 2018) (per curiam) ("The PLRA 'requires proper exhaustion,' which 'means using all steps that the agency holds out, and doing so *properly*,' to allow the agency a full and fair opportunity to address the issues on the merits.") (quoting *Woodford*, 548 U.S. at 90, 93) (emphasis in original). "'Proper exhaustion,' therefore, 'demands compliance with an agency's deadlines and other critical procedural rules.'" *Woodhouse*, 741 F. App'x at 178 (quoting *Woodford*, 548 U.S. at 90). "And given the PLRA's 'mandatory language,' there is no room to excuse a failure to exhaust all available remedies, even to take into account 'special circumstances' that might otherwise

justify noncompliance with procedural requirements." *Moss*, 19 F.4th at 621 (quoting *Ross v. Blake*, 578 U.S. 632, 642 (2016)); *see also Woodhouse*, 741 F. App'x at 177–78 ("[C]ourts have no discretion to waive the exhaustion requirement.") (citing *Woodford*, 548 U.S. at 85). Still, "because 'failure to exhaust is an affirmative defense under the PLRA,' defendants bear the burden of establishing that a prisoner has failed to exhaust his administrative remedies." *Woodhouse*, 741 F. App'x at 178 (quoting *Jones*, 549 U.S. at 216).

"[T]he only exception to the PLRA's exhaustion requirement is when an administrative remedy is not 'available.'" *Williams v. Carvajal*, 63 F.4th 279, 285 (4th Cir. 2023) (citing *Ross*, 578 U.S. at 642). An administrative remedy is unavailable, and thus the PLRA does not require exhaustion, if the would-be remedy is "officially on the books" but is not "capable of use to obtain relief." *Moss*, 19 F.4th at 621 (quoting *Ross*, 578 U.S. at 643). A prisoner may demonstrate that an administrative remedy is "unavailable" by showing that (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates" (e.g., "if administrative officials have apparent authority, but decline ever to exercise it"), (2) it is "so opaque that it becomes, practically speaking, incapable of use" (e.g., where "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it"), or (3) "the prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation" (e.g., where "officials misl[ead] or threate[n] individual inmates so as to prevent their use of otherwise proper procedures"). *Ross*, 578 U.S. at 643–44. The Fourth Circuit has stated that "[j]udges may resolve factual disputes relevant to the exhaustion issue without the participation of a jury." *Woodhouse*, 741 F. App'x at 178 (citations omitted).

### B.  Operating Procedure 866.1

In support of their motion for summary judgment, Defendants provide the affidavit of T. Still, the Grievance Coordinator for Red Onion. (ECF No. 29-1 at 1–8.) Still's affidavit is accompanied by Virginia Department of Corrections ("VDOC") Operating Procedure ("OP") 866.1 and Price's grievance records related to his claims against Defendants. (*Id.* at 9–38.) In his declaration, Still explains the administrative process for resolving disputes that was in effect for VDOC inmates at the time of the events described in the complaint. (*See id.* at 1–8.) As Still explains, OP 866.1 generally governs the inmate grievance procedure and "provides that all issues which affect the grievant personally are grievable except those pertaining to policies, procedures, and decisions of the Virginia Parole Board, disciplinary hearings, State and Federal [c]ourt decisions, laws and regulations, and other matters beyond the control of the VDOC." (*Id.* at 2.)

The enclosed copy of OP 866.1 reveals that the first step in the inmate grievance procedure is to attempt to resolve the issue informally, first orally and then by submitting an informal written complaint. (*Id.* at 12.) The written complaint must be received by the Institutional Ombudsman or designated staff within 15 days of the incident leading to the complaint. (*Id.* at 2–3, 13.) Prison staff are to provide a written response on the complaint form within 15 days. (*Id.* at 3, 14.)

If the inmate is dissatisfied with the response or if staff fail to provide a written response within 15 days, the inmate can submit a regular grievance on the issue within 30 days of the event about which he is complaining. (*Id.* at 3, 14.) A regular grievance must comply with the requirements of OP 866.1 to be accepted at intake. (*Id.* at 3, 15.)

- 9 -

A regular grievance that does not meet the filing requirements will be returned to the inmate within two business days of its receipt and will include the reason for the rejection and instructions on how to correct and resubmit the form, where feasible. (*Id.* at 3) If the inmate desires a review of the intake decision, he may send the returned grievance form to the Regional Ombudsman. (*Id.* at 3–4.) Pursuing an intake appeal of a rejected grievance, alone, does *not* constitute complete administrative exhaustion, but it is a *step towards* exhaustion. (*Id.* at 4); *Jackson v. Barksdale*, No. 7:17-cv-00031, 2017 WL 3446259, at *5 (W.D. Va. Aug. 10, 2017) ("[S]uch final intake decisions do not constitute exhaustion of administrative remedies."), *aff'd*, 707 F. App'x 786 (4th Cir. 2018) (per curiam); *Hailey v. Clary*, No. 7:17-cv-00260, 2018 WL 2123623, at *2 (W.D. Va. May 8, 2018) (same). If the regular grievance does not meet the criteria for acceptance, and the review by the Regional Ombudsman does not result in intake into the grievance process, the issue must be resubmitted in accordance with OP 866.1 for acceptance. (ECF No. 29-1 at 4.) There is no further review of the intake decision. (*Id.*)

If regular grievance is accepted for intake, the Facility Unit Head or Assistant Facility Unit Head prepares a Level I response to the grievance within 30 days. (*Id.* at 4, 18.) An inmate who is not satisfied with the outcome of his Level I review may appeal that decision to Level II. (*Id.* at 4.) Level II reviews are conducted by either the Regional Administrator, the Health Services Director, the Chief of Operations for Classification and Records, or the Superintendent for Education, and those responses must be issued within 20 days. (*Id.* at 4, 20.) Level II is the final level of review. (*Id.* at 4.) Regular grievances must be accepted at intake and then appealed through all levels of available review without satisfactory resolution of the issue to satisfy the exhaustion requirement prior to filing suit. (*Id.* at 4.)

Additionally, an inmate may file an emergency grievance if he believes that there is a situation or condition which may subject him to immediate risk of serious personal injury or irreparable harm. (*Id.* at 4.) An emergency grievance should be responded to within eight hours. (*Id.*) If the VDOC staff member responding to the emergency grievance determines that the issue does not subject the inmate to immediate risk of serious personal injury or irreparable harm, this is indicated on the emergency grievance form which is signed with the date and time. (*Id.*) If the staff person does determine that such risk is present, he or she will either address the issue or forward it to a higher authority for resolution. (*Id.* at 4–5.) Filing an emergency grievance alone does not satisfy the exhaustion requirement. (*Id.* at 5.) To satisfy the exhaustion requirement, the inmate must submit his complaint by filing a regular grievance with the appropriate documentation and appeal it through all available levels of review. (*Id.*)

## C. Price's Submissions

Still's review of Price's grievance file at Red Onion reveals that Price made the following submissions related to his claims against Defendants. In a written complaint dated March 14, 2024, Price stated as follows:

> [On March 13, 2024, from approximately 9:15 a.m. to 10:15 a.m.], Sergeant M. Hubbard [was] assigned as my advisor. I asked to talk to him without the IHO present [but] they refused. I said I was gone [sic] write them up. I was denied [a] hearing and removed and assaulted in [the] B-1 entry by [the] metal detector with Sgt. Jones['] body camera rolling, and [was] written a false charge . . . the next day claiming I threatened . . . Sgt. Hubbard[.] Please preserve all cameras.

(ECF No. 29-1 at 30.)

- 11 -

After Price received a response to his written complaint stating that "[a]ll camera footage on [the] date and time listed above have [sic] been saved," (*id.*), Price submitted a regular grievance stating as follows:

> I disagree with the decision saying [that] y[']all gone [*sic*] just keep the footage[.] [T]his can happen again[.] [T]he officers here and [at] Wallen's Ridge are repeatly [*sic*] assaulting inmates[.] I'm really fearing for my life here at Red Onion State Prison [and] in this whole region.

(*Id.* at 31.) As his "Suggested Remedy," Price requested:

> I'm asking for y[']all to treat me like [a] human and get me out [of] this region where I won[']t be assaulted again.

(*Id.*)

Price did not sign or date the regular grievance, and it was rejected at intake for those reasons. (*See id.* at 32.) Price later submitted an identical regular grievance that was signed and dated. (*Id.* at 35.) But this grievance was also rejected at intake on the grounds that it appeared to raise issues yet to occur and failed to identify how the issues caused Price personal harm or loss. (*Id.* at 36.) Price appealed the intake decision to the Regional Ombudsman, but the decision was upheld. (*See id.*)

On March 15, 2024, Price filed a written complaint that was identical to the one he filed the day prior. (*Id.* at 38.) On April 4, 2024, Unit Manager Q. Reynolds responded to the written complaint by stating that he "ha[d] no knowledge of [the] incident" and that Price could "definitely appeal any conviction that [he] receive[d]." (*Id.*) According to his grievance file, Price did not attempt to submit a regular grievance related to this written complaint. (*See id* at 7.)

### D. Discussion

Here, the undisputed facts in the record show that Price failed to exhaust his administrative remedies under OP 866.1. As noted, Price filed two regular grievances in March 2024 raising issues relevant to his claims against Defendants. But both grievances were rejected at intake, and the intake rejections were affirmed on appeal. And though Price filed a written complaint on March 15, 2024 that was identical to the one he submitted earlier, he did not attempt to file a regular grievance related to the complaint. Under OP 866.1, Price failed to exhaust his administrative remedies when he did not rectify the errors identified at intake regarding his regular grievances and failed to submit a regular grievance related to his March 15, 2024 written complaint. (*See* ECF No. 29-1.) Moreover, Price has not shown that administrative remedies were unavailable to him. *See Strickland v. Wang*, No. 7:11-cv-00358, 2013 WL 866075, at *1 n.1 (W.D. Va. Mar. 7, 2013) ("The burden of showing that administrative remedies were unavailable lies with the plaintiff" (citing *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir. 2011). To the contrary, the record evidence shows that Price was able to submit written complaints and regular grievances concerning issues relevant to his claims against Defendants.

But Price's failure to exhaust his administrative remedies under OP 866.1 is not dispositive as to all of his claims against Defendants. As noted, Price claims that Hubbard and Ramey violated his constitutional rights by committing procedural errors during his disciplinary hearings.[6] (*See* Compl. at 14–15.) Procedural errors in disciplinary hearings are non-grievable under OP 866.1 and instead must be raised in accordance with a separate OP—

---

[6] Although Price frames these constitutional violations as arising under the First and Eighth Amendments, they could be construed as due process claims. Because Price is proceeding *pro se*, the court must liberally construe his allegations. *See King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016).

- 13 -

specifically, OP 861.1.[7] (*See* ECF No. 29-1 at 15.) Additionally, Price asserts state tort claims against Hubbard and Jones. (*See* Compl. at 14.) Although the Fourth Circuit does not appear to have addressed the issue, various federal courts have held that the PLRA's exhaustion requirement does not apply to a prisoner's state-law claims. *See Aycock v. Malhi*, No. 1:24-cv-02126, 2026 WL 312724, at *7 n.8 (M.D. Penn. Feb. 5, 2026) (collecting cases); *see also* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions *under section 1983 of this title, or any other Federal law*, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted") (emphasis added). The court takes the *Ayock* opinion and the cases it cites as persuasive authority on this issue. Accordingly, though Price's failure to exhaust administrative remedies under OP 866.1 warrants summary judgment on some of his claims, it does not warrant entry of judgment as to his procedural-error or state-law claims.

## IV.     CONCLUSION

For the reasons stated above, the court will grant the motion for summary judgment in part and deny it in part.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 7th day of August, 2026.

/s/ *Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE

---

[7] The practical significance of applying OP 861.1 to Price's procedural error claims is unknown to the court. Defendants do not address the issue in their briefing (*see* ECF No. 29) and the court will not address it *sua sponte*.

- 14 -